UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                     :
BRANDI KATHERINA ORTIZ               :          3:13 CV 610 (JGM)
                                     :
V.                                   :
                                     :
CAROLYN W. COLVIN,                   :
ACTING COMMISSIONER OF               :
SOCIAL SECURITY                      :
                                     :          DATE: MARCH 3, 2014
------------------------------------------------------ x
```

RECOMMENDED RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE
COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"] and Supplemental

Security Income ["SSI"].

I.  ADMINISTRATIVE PROCEEDINGS

On April 23, 2010, plaintiff, Brandi Katherina Ortiz, applied for DIB, followed by an

application for SSI filed on May 24, 2010, in which applications plaintiff claims that she has

been disabled since May 1, 2009 due to fibromyalgia, post-traumatic stress disorder

["PTSD"], substance abuse, and brain damage. (Certified Transcript of Administrative

Proceedings, dated June 8, 2013 ["Tr."] 11, 154-67; see also Tr. 184-210).   Plaintiff's

applications were denied initially and upon reconsideration.  (Tr. 97-100, 102-04; see Tr. 55-

96).  On February 10, 2011, plaintiff filed a request for a hearing before an Administrative

Law Judge ["ALJ"](Tr. 105-10), and on January 31, 2012, a hearing was held before ALJ

James E. Thomas, at which plaintiff and Jeff R. Blank, PhD, a vocational expert (Tr. 150-53),

testified. (Tr. 25-54; see Tr. 125-53).  Plaintiff has been represented by counsel. (Tr. 101).

On February 24, 2012, ALJ Thomas issued his decision finding that plaintiff has not been under a disability from May 1, 2009 through the date of his decision.  (Tr. 8-21).  On April 19, 2012, plaintiff filed her request for review of the hearing decision (Tr. 7), and on March 12, 2013, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).

On April 26, 2013, plaintiff filed her complaint in this pending action.  (Dkt. #1).[1]  On June 27, 2013, defendant filed her answer  (Dkt. #10), and on August 29, 2013, plaintiff filed her Motion to Reverse the Decision of the Commissioner, with brief in support.  (Dkt. #12).  On November 19, 2013, defendant filed her Motion to Affirm the Decision of the Commissioner and brief and exhibit in support (Dkt. #15; see Dkts. ##13-14),[2] and two weeks later, on December 9, 2013, another copy of the answer, along with a copy of the certified administrative transcript, dated June 8, 2013, was filed.  (Dkt. #16).   That same day, on December 9, 2013, plaintiff filed her reply brief.  (Dkt. #19).

Accordingly, for the reasons stated below, plaintiff's Motion to Reverse the Decision of the Commissioner, and/or Remand (Dkt. #12) is granted in part such that this matter is remanded for further proceedings consistent with this Recommended Ruling; defendant's Motion to Affirm (Dkt. #15) is denied.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

Plaintiff was born in 1980 and is thirty-three years old.  (Tr. 28).  She lives with her parents  (Tr. 39, 317), and has two sisters.  (Tr. 317).  Plaintiff completed the twelfth grade

---

[1]Plaintiff also filed a Motion to Proceed in Forma Pauperis (Dkt. #2), which motion was granted three days later.  (Dkt. #6).

[2]Attached to defendant's motion is a copy of unpublished case law.

(Tr. 28).

Plaintiff testified that in 2006, when she was seven months pregnant, she had eclampsia and two grand mal seizures, as the result of which she miscarried her baby.  (Tr. 30-31).   Plaintiff testified that she had swelling on her brain from the seizures, and had "issues with, like, writing, and math, and stuff like that.  But mostly, it was just the pain issues and not being able to really walk well, or pick up heavy things[.]" (Tr. 32; see Tr. 33-34).  In her application for disability, she reported that after being in a coma for three days following the miscarriage, she had "damage at the back of [her] brain[]" and she could not read, add or stand up straight.  (Tr. 195).  Plaintiff reported that it took her six months to learn to read, add and drive a car.  (Id.).  However, she continued to have pain all the time. (Id.).  Plaintiff has pain in her arms and lower back, but her "legs are really the worst."  (Tr. 33).  Plaintiff testified that she can sit for about a half an hour and then has to get up to stretch her legs because they get "tight and uncomfortable[]" and her back "starts to ache." (Tr. 34).  Walking makes her legs hurt, and she can only stand for fifteen to twenty minutes (Tr. 34-35), and only showers once every three days due to pain.  (Tr. 201).  According to plaintiff, she cannot "even really walk around [the] block[]" and she is "very clumsy."  (Tr. 35).  She was advised by one of her doctors to exercise but she testified that she does not exercise other than gardening and walking her dog halfway around the block.  (Tr. 44-45).

She testified that she takes Gabapentin for pain, but that medication makes her drowsy.  (Tr. 40-41; see Tr. 214).[3]  When asked about the medical entries that reflect that her pain has improved, plaintiff testified that she does well when she is "sitting in [her] house" or "going to the store once a week[,]" but she wants to do more, like hold a job and

---

[3]Plaintiff also takes or has taken Flexeril and Nexium.  (Tr. 214).

she does not think that she "can do that right now," even though her pain and "situation" is "better than it was, it's still not good enough for [her][.]" (Tr. 47-48).

Plaintiff testified that during the week she goes to the library or the grocery store, although she uses a riding cart and she needs someone else to carry her groceries to the car and bring them in the house.  (Tr. 35-36).   When she returns home from being out, she takes a nap because she is "beat[.]" (Tr. 37).

According to plaintiff, before the miscarriage, she used "recreational drugs, like ecstasy or cocaine . . . intermittently." (Tr. 31).  When she was pregnant she "stopped all drug use[,]" but when she was in the hospital, they gave her Dilaudid and Vicodin, and when she continued to have pain, she "started supplementing [herself] with pills from the streets . . . [a]nd then it just kind of snowballed down." (Id.).

Plaintiff testified that she "stop[s] in the middle of a sentence and space[s] out." (Tr. 38-39).  When she was treated at Behavioral Health Services of the Hospital of Central Connecticut in 2008, plaintiff reported that she cannot keep track of video games or board games.  (Tr. 326).

She has headaches two or three times a month for which she takes Imitrex.  (Tr. 39-40; see Tr. 214). The headaches last about two days and she just lays in bed with the lights out, curtains drawn and earplugs in her ears.  (Tr. 40).

Plaintiff is treated by counselors at the Community Health Center in New Britain for stress, anxiety and depression.  (Tr. 42; see also Tr. 46).  When she is anxious she has a fast heartbeat, a "stabbing pain in her heart[,]" sees things out of the corner of her eye, and she cries often.  (Tr. 42-43).  She takes Cymbalta.  (Tr. 42; see Tr. 214).  She feels like she does not have "the mental or the physical ability to focus on any sort of  - - of any kind of labor."

4

(Tr. 45).  She has had these symptoms since before she stopped working.  (Tr. 43-44).  She testified that her fiancé at the time "kind of forced [her] to go back to work."  (Tr. 44).

### B. PLAINTIFF'S WORK HISTORY & VOCATIONAL ANALYSIS

Plaintiff testified that she last worked in May 2009 waiting tables, bartending and cashiering.  (Tr. 30; see generally Tr. 180-83, 189).  At the hearing, the vocational expert testified that plaintiff's last work as a bartender is light work (Tr. 48-49); her work as a waitress is unskilled light work (Tr. 49); and her work as a cashier also is unskilled light work. (Id.).  In response to the ALJ's hypothetical of a claimant who can work at the light exertional level, with occasional climbing of ramps and stairs, and occasional balancing, stooping, kneeling, crouching and crawling, no climbing of ropes, ladders, or scaffolds, and no exposure to hazards, who is limited to unskilled jobs consisting of simple, routine, repetitive tasks with short, simple instructions and an attention span to perform simple work tasks for two-hour intervals, the vocational expert testified that such a person could perform all of plaintiff's past work.  (Tr. 49-50).  When asked if a claimant, with all of the previously listed limitations and a sit-stand option can perform plaintiff's past work, the vocational expert responded that he thought "some cashiering work" would allow for a sit-stand option, such as work as a parking lot cashier, cafeteria cashier, and amusement recreation cashier. (Tr. 50).[4]  If a claimant can only stand or walk for two hours of the work day, the claimant could not perform these cashier positions, but could perform jobs at a sedentary range of exertion such as work as a small parts assembler, work in inspecting positions, and work as a grinder.  (Tr. 50-52).  However, if an individual was off-task an additional fifteen percent

---

[4]When inquiring about the sit-stand option, the ALJ acknowledged that such a limitation is not recognized in the DOT; the vocational expert testified that the portion of his opinion relating to that limitation is from his "observation, personal knowledge, and research."  (Tr. 52).

during the work day, or if the individual was absent on a regular basis, like two times a month, all of these jobs would be precluded.  (Tr. 52).

C. MEDICAL RECORDS

Plaintiff's relevant medical records begin on August 29, 2006 when plaintiff was seen at the Emergency Department of Bristol Hospital after reporting having had a seizure at home and again when the EMTs arrived.  (Tr. 224-26, 230-31, 233-34, 237; see Tr. 343, 346).[5]  She was diagnosed with a seizure and eclampsia.  (Id.).  At that time, plaintiff was twenty-nine weeks pregnant; she miscarried the baby.  (Tr. 227-28, 232, 236).  A CT scan of plaintiff's brain revealed multiple abnormal foci with a small focus of acute hemorrhage within one of them.  (Tr. 229, 235, 238).  Plaintiff was transferred to New Britain Hospital (Tr. 232; see Tr. 338-56), where she was admitted to the Intensive Care Unit.  (Tr. 339).  An MRV and MRA of plaintiff's head were taken; the results of both were normal.  (Tr. 352).  MRI results, however, revealed evidence of acute ischemic changes, and no evidence of hemorrhage or enhancement. (Tr. 353; see also Tr. 354).  Plaintiff was diagnosed with HELLP syndrome,[6] severe preeclampsia, eclampsia and a fetal demise at twenty-nine weeks.

---

[5]There are many medical records that pre-date plaintiff's onset date of disability that are not connected to the impairments alleged in plaintiff's application for benefits.  (See Tr. 222 (normal MRI of left knee); 223 (CT scan of abdomen and pelvis revealing 2.5 cm right ovarian cyst); 240, 426-34 (urinary tract infection); 241-42 (upper respiratory infection); 243-51 (complaints of knee pain); 252-54, 262-64 (seeking Percocet for abdominal pain from ovarian cysts); 265 (pelvic ultrasound); 268-70 (Vicodin for abdominal pain); 398-405 (chest pain); 406-12 (knee pain); abdominal pain from ovarian cysts (Tr. 415-25); abdominal pain (Tr. 435-67); and foot pain (Tr. 468-83)).

Plaintiff has a history of cervical cancer.  (Tr. 323).  Additionally, the administrative transcript contains medical records belonging to a man with the same last name. (Tr. 273-75).

[6]HELLP syndrome is characterized by Hemolysis, Elevated Liver enzymes, and Low Platelet count; it is a type of severe preeclampsia.  See http://www.webmd.com/baby/tc/hellp-syndrome-and-preeclampsia-topic-overview (last visited February 6, 2014).

(Tr. 339-40).  Plaintiff's baby was delivered by cesarean section and plaintiff was discharged from the hospital six days later.  (Tr. 340, 345, 347).

A year and a half later, on January 10, 2008, plaintiff was seen in the Emergency Department of The Hospital of Central Connecticut for a migraine headache, nausea and vomiting.   (Tr. 484-93).   Six days later, she was admitted to The Hospital of Central Connecticut for ataxia, from January 16 to January 18, 2008.  (Tr. 357).  Upon discharge, she was diagnosed with depression and headache. (Id.). Plaintiff was referred for pain management and for a neurology consultation to address her complaints of severe headache, leg weakness, muscle spasms and twitching, with gait disturbance.  (Tr. 388-96).  The nurses reported that plaintiff "frequently has a depressed affect, and has been found crying at times."  (Tr. 385).  At that time, plaintiff was taking Senokot, Klonopin, Imitrex, Tylenol, Zolpidem, and was receiving Dilaudid intravenously.  (Tr. 386).  Plaintiff was informed of the benefits of counseling to help get rid of her pain, in response to which she laughed.  (Tr. 387).  No etiology for her pain was found, and the "possibility of conversion reaction or other psychological reaction contributing to her pain experience[]" was noted.  (Id.).

During plaintiff's neurology consult, it was noted that she was unsteady when walking, and has "a narrow based gait and always catches herself. Then the gait almost gets back to normal and then becomes unsteady again.  This raises the issue of whether there could be some psychological components to her problems."  (Tr. 390).

Plaintiff underwent treatment from the Hospital of Central Connecticut's Behavioral Health Services from February 27, 2008 until she was discharged on May 13, 2008 for repeated cancellations. (Tr. 308-35). Plaintiff presented with "debilitating" panic attacks and depression since her miscarriage in 2006.  (Tr. 313).  She reported that she had difficulty

walking and suffers from leg pain since her 2006 hospitalization.  (Id.).  The intake provider noted that plaintiff's "neurologist questioned [a] psychological component[.]" (Id.). Over the course of her treatment, plaintiff reported that her walking was "getting better."  (Tr. 326).

Plaintiff reported that she used ecstasy from age twenty until about five years ago, and that she still occasionally used cocaine.  (Tr. 315).  Plaintiff also reported that she has a history of mood disturbance dating back to childhood, resulting from abuse she suffered from her stepfather.  (Tr. 319).  Additionally, she has an inability to walk properly "with no medical cause found."  (Id.).  Plaintiff was diagnosed with mood disturbance disorder, recurrent, panic disorder, and rule out conversion disorder.  (Id.).  She was assigned a GAF of 45.  (Id.). [7]

From May 3 to May 8, 2009, plaintiff was treated at Cedar Ridge Mental Health Services at Cedarcrest Hospital for opiate detoxification.  (Tr. 277-307).  Upon admission, plaintiff reported that she has been injecting thirty bags of heroin for the past year, and has been abusing Percocet for at least the past three months for her chronic pain. (Tr. 277; see Tr. 289, 298, 300).  Plaintiff was placed on  Methadone and was prescribed Gabapentin for her chronic leg pain.  (Tr. 278, 280-81).[8]  Upon discharge, her GAF was 65, with a score of 50 in the past.  (Tr. 278).

Plaintiff was seen by Dr. Shilpa Rajashekar of the Community Health Center on August 18 and September 25, 2009 for her "unexplained leg pain" which was assessed as

_____

[7]On June 11, 2008, plaintiff was treated in the Emergency Department for toe pain.  (Tr. 494-500).

[8]Lunesta was also prescribed.  (Tr. 278).

fibromyalgia.[9]  (Tr. 529-32).  She returned on November 5, 2009; she reported her pain as "unbearable and severe."  (Tr. 533).  She reported that she was unable to stand and had been sleeping all day.  (Id.).

On November 24, 2009, plaintiff was admitted to the hospital of Central Connecticut for a fever following the intravenous use of heroin two days prior; she was discharged the next day.  (Tr. 360-82).  At the time, plaintiff was also taking Vicodin for her chronic leg pain. (Tr. 363, 366, 368).

Plaintiff began treating with Dr. Crispin Abarientos of the Middlesex Multispeciality Group on November 2, 2009.  (Tr. 510-12; see Tr. 513-21).  Plaintiff reported that she was taking Amitriptyline which, Dr. Abarientos noted, "helps her with her sleep and pain somehow."  (Tr. 510).  Dr. Abarientos opined that plaintiff's "clinical picture is suggestive of fibromyalgia or chronic pain syndrome[]"   but her clinical exam "is completely

---

[9]Fibromyalgia is a human disorder classified by

the presence of chronic widespread pain and tactile allodynia. While the criteria for such an entity have not yet been thoroughly developed, the recognition that fibromyalgia involves more than just pain has led to the frequent use of the term "fibromyalgia syndrome". In addition to muscular pain and stiffness, this ailment can also cause fatigue, sleep problems, depression, and an inability to think. Other symptoms associated with fibromyalgia are headaches, nervousness, numbness, dizziness, and intestinal disturbances. The disorder is not directly life-threatening. The degree of symptoms may vary greatly from day to day with periods of flares (severe worsening of symptoms) or remission; however, the disorder is generally perceived as non-progressive. No simple blood test or x-ray can diagnose fibromyalgia. The diagnosis is made solely by taking a history and doing a physical exam. According to the American College of Rheumatology, before the diagnosis of fibromyalgia can be made, the muscle pain must be present for longer than three months. Also, pain must occur at specific sites on the body called tender points. There are [eighteen] of these sensitive spots. Most are located on the neck and back. A doctor makes the diagnosis by applying mild pressure to the tender points. If discomfort occurs at [eleven] or more of these points, then the physical exam is positive for fibromyalgia.

Montanez v. Astrue, No. 07 CV 1039(MRK)(WIG), 2008 WL 3891961, at *8, n. 5 (D. Conn. Aug. 1, 2008), citing http://www.emedicinehealth.com/fibromyalgia/article—em.htm; http://en.wikipedia.org/wiki/Fibromyalgia.

unremarkable with [a] normal bone scan." (Tr. 511; see Tr. 578 (normal bone scan)).  Dr. Abarientos continued plaintiff on Amitriptyline and increased the dosage of Neurontin. (Tr. 511).

Plaintiff was seen by Orthopedic Associates of Middletown on November 30, 2009, upon referral of Dr. Rajashekar, for an evaluation of her back and bilateral leg pain.  (Tr. 535).  Her gait and posture were normal and there was some mild tenderness to palpation of the lumbar spine.  (Id.). Her range of motion in the lumbar spine was limited by 80% with pain in flexion and extension, and the straight leg raising was positive bilaterally.  (Id.).  She was given narcotic medications to help reduce her reliance on heroin.  (Id.).

On December 2, 2009, plaintiff returned to Middlesex Hospital seeking a refill of Gabapentin.  (Tr. 508-09).  On the same day, plaintiff underwent an MRI of the lumbosacral spine, the results of which were normal.  (Tr. 537).

Plaintiff returned to Orthopedic Associates on December 21, 2009, for her bilateral lower extremity pain; it was recommended that plaintiff undergo nerve conduction studies to determine the cause of the pain and the numbness in her feet.  (Tr. 536). On the same day, plaintiff was admitted to the Hartford Dispensary Methadone Maintenance Treatment Program for treatment of opioid dependence. (Tr. 522, 528).

Dr. Abarientos saw plaintiff again on January 20, 2010, at which time plaintiff went through pain management, was started back on Methadone, and was taking Neurontin. (Tr. 504-05).  Plaintiff reported that her "pain is significantly better and her depression is relatively under good control." (Tr. 504). Plaintiff was seeing a counselor and she stopped Cymbalta and Amitriptyline "and does not feel the need for any antidepressant." (Id.).  She reported "occasional breakthrough pain but claim[ed] she is not preoccupied with pain

anymore like before." (Id.). Dr. Abarientos assessed plaintiff as having chronic pain syndrome, fibromyalgia, and depression, "clinically better." (Tr. 505). Plaintiff returned on March 17, 2011, at which time she complained of being "more depressed lately[,]" and she complained of having more severe headaches, which usually respond to Imitrex. (Tr. 538; see Tr. 538-39). Plaintiff reported that she had headaches about three times a month now that she is using Imitrex, and the headaches usually last for at least twenty-four to forty-eight hours and are accompanied by nausea and photophobia. (Tr. 538). When plaintiff returned on April 21, 2010, she was "[d]oing well" on Neurontin (Tr. 502), and Dr. Abarientos noted that plaintiff denied significant pain. (Tr. 501). Plaintiff reported that "she sometimes skips her dose of Neurontin during the day when her pain is not significant[,]" and she is "trying to stay active." (Id.). She has intermittent generalized pain but it is "tolerable and better since she started Neurontin." (Id.).

On July 21, 2010, Dr. Abarientos noted that plaintiff's pain is "under relatively good control[,]" she has been exercising and doing a lot of gardening, as well as walking the dog, but "complains of soreness after doing a lot of activities." (Tr. 523). In addition to taking Neurontin and Methadone, she was taking ibuprofen for the pain. (Id.). Her pain was a three out of ten and she presented with multiple tender points. (Id.). Dr. Abarientos noted that plaintiff's fibromyalgia was "clinically stable." (Id.).

On August 5, 2011, plaintiff began substance abuse treatment with Irene Nurse-Cohen at the Community Health Center. (Tr. 542-44). Plaintiff was taking Methadone, Neurontin, ibuprofen, Imitrex, and Cymbalta. (Tr. 542). She was assigned a GAF of 55. (Tr. 544). Plaintiff returned to Nurse-Cohen on August 19, September 23, October 7, November 11 and December 16, 2011. (Tr. 545-50, 554-57). Plaintiff reported attending counseling

sessions.  (Tr. 545, 547, 549,  554, 556).  She was assigned a GAF score of 65.  (Id.).

On July 28, 2011, plaintiff requested a referral to Behavioral Health for severe depression; Dr. Nguyen noted plaintiff's complaints of sad mood, low energy, poor concentration, irritability, feelings of worthlessness and feelings of guilt.  (Tr. 540; see Tr. 540-41).  Dr. Nguyen assessed plaintiff with depression, major NOS, and he prescribed Cymbalta.  (Tr. 540).

On August 16 and 26, 2011, plaintiff followed-up with Dr. Nguyen to review her routine lab results; she had no new complaints or concerns.  (Tr. 558-62, 563-65).  Plaintiff's chronic pain syndrome (Tr. 562), and depression were noted and she continued treatment with Cymbalta.  (Tr. 565).  On September 2, 2011, an ultrasound of plaintiff's abdomen revealed an enlarged fatty liver.  (Tr. 577).[10]

On October 17, 2011, plaintiff underwent an initial intake regarding mental health treatment at the Community Health Center by Dr. Alok Banga.  (Tr. 551-53).  Plaintiff was taking Cymbalta and she reported a depressed mood, low energy, low concentration, and crying spells without triggers.  (Tr. 551).  She was assessed as having depression with anxiety.  (Tr. 552).

D. MEDICAL OPINIONS

On August 13, 2010, Dr. Nathaniel Kaplan completed a Residual Functional Capacity Assessment in which he opined that plaintiff can occasionally lift and/or carry twenty pounds and can frequently lift and/or carry up to ten pounds, and can stand and/or walk, or sit about six hours in an eight hour day.  (Tr. 61-62, 71-72).

_____

[10]In October 2011, plaintiff was treated for an upper respiratory infection.  (Tr. 569-70; see also Tr. 567-68 (received flu vaccine)).  In November and December 2011, plaintiff was seen by her Ob/Gyn.  (Tr. 571-76).

On October 29, 2010, Robert Deutsch, PhD completed a Psychiatric Review Technique of plaintiff for 12.04 Affective Disorders.  (Tr. 60, 70).  He concluded that plaintiff has mild restriction of activities of daily living, mild difficulties maintaining social functioning, concentration, persistence or pace, and one or two episodes of decompensation.  (Id.). On January 27, 2011, Christopher Leveille, PsyD completed an identical Psychiatric Review Technique of plaintiff which repeated the same conclusion as Dr. Deutsch.  (Tr. 80-81, 89-90).

On October 16, 2010, Dr. Yonus Pothiawala completed a Psychiatric Evaluation of plaintiff for Connecticut Disability Determination Services.  (Tr. 525-27).  Plaintiff informed Dr. Pothiawala that Motrin and Neurontin have been "somewhat helpful to her[,]" and she complained of feeling depressed because she is not able to do things.  (Tr. 525).  Plaintiff reported that she sleeps too much and has crying spells.  (Id.; see also Tr. 526).  According to plaintiff, she last worked in March 2009 as a waitress and she quit that job because she went for drug rehab.  (Tr. 526). She reads and watches television, takes her grandmother and father to medical appointments, goes to the Hartford Dispensary daily, goes grocery shopping, does light housework and does some of the cooking.  (Id.). "However," as Dr. Pothiawala observed, plaintiff "does not seem to have major problems in terms of socializing with people and also relating to people." (Id.).   She appeared "moderately despondent as well as mildly anxious" and she expressed feelings of helplessness.  (Id.). Dr. Pothiawala noted that plaintiff seems to present with clinical conditions suggestive of dysthymia secondary to her physical problems. (Tr. 527).

On January 24, 2011, Dr. Abarientos completed a Fibromyalgia Medical Source Statement on behalf of plaintiff in which he noted that plaintiff has eighteen tender points

and her symptoms include: hypersensitivity to touch, fatigue, chronic widespread pain, sleep disturbance, muscle weakness, subjective swelling, premenstrual syndrome, frequent severe headaches, cognitive dysfunctions, PTSD, numbness and tingling, dysmenorrhea, dizziness, chronic fatigue syndrome, depression, seizure disorder, and a history of intravenous drug use and Methadone maintenance.  (Tr. 580; see Tr. 580-83).[11]  According to Dr. Abarientos, plaintiff's pain is in her lumbosacral spine, cervical spine, thoracic spine, chest, and bilateral shoulders, arms, hands/fingers, hips, legs, knees, ankles and feet.  (Tr. 581). Her pain is "moderate to severe, generalized, involving all joints [and] muscles[,]" and her pain is precipitated by changes in weather and fatigue.  (Id.).  She takes Gabapentin which causes mild drowsiness.  (Id.).  She can walk half a block, sit and stand for fifteen minutes at a time, stand/walk for about two hours, and sit for about four hours.  (Id.).  She needs to shift positions and must walk every hour for about fifteen minutes.  (Tr. 582).  Additionally, she may need to take unscheduled breaks three to four times a day for fifteen to twenty minutes.  (Id.).  According to Dr. Abarientos, plaintiff can occasionally lift ten pounds, and can occasionally stoop, crouch or squat, and look down, but can rarely climb stairs and ladders.  (Id.).  Dr. Abarientos opined that plaintiff is likely to be off task about twenty-five percent or more of the workday, and she is likely to have good days and bad days and will be absent more than four days a month.  (Tr. 583).

On February 3, 2011, Dr. Firooz Golkar completed a Residual Functional Capacity Assessment of plaintiff identical to the assessment completed by Dr. Kaplan.  (Tr. 82, 91).  He also noted that plaintiff can frequently climb ramps, stairs, ladders, ropes and scaffolds, and can frequently balance, stoop, kneel, crouch and crawl.  (Tr. 82-83, 91-92).

---

[11]See note 9 supra.

14

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008), quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).   However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.   See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment.  See 20 C.F.R. §§  404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. §§  404.1520(a)(4)(iii), 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work.  See 20 C.F.R. §§  404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant shows that she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. §§

16

404.1520(a)(4)(v), 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Thomas found that plaintiff has not engaged in substantial gainful activity since May 1, 2009, the alleged onset date of her disability.  (Tr. 13; see 20 C.F.R. §§ 404.1571 et seq. and 416.971 et seq.).  ALJ Thomas then concluded that plaintiff has the following severe impairments: fibromyalgia, affective disorder, anxiety disorder, and substance abuse disorder (Tr. 13-14; see 20 C.F.R. §§ 404.1520(c) and 416.920(c)), but her impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.  (Tr. 14-15; see 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). In addition, at step four, ALJ Thomas found that after consideration of the entire record, plaintiff has the RFC to perform light work as defined in 20 C.F.R. §§  404.1567(b) and 416.967(b) except that she requires a sit/stand option and is limited to no more than two hours of standing/walking in an eight-hour workday; she is limited to occasional balancing, stooping, kneeling, crouching, and crawling, and no exposure to hazards; she is limited to jobs involving simple routine, repetitive tasks with short simple instructions and few workplace changes; and she is limited with an attention span to perform simple work tasks for two-hour intervals throughout an eight-hour workday.  (Tr. 15-19). Plaintiff is unable to perform her past relevant work (Tr. 19; 20 C.F.R. §§  404.1565 and 416.965), but the ALJ concluded there are jobs that exist in significant numbers in the national economy that plaintiff can perform, such as the job of a small parts assembler, inspector, and grinder.  (Tr. 19-20; see 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, 416.969(a)). According to the ALJ, plaintiff has not been under a disability from May 1, 2009 through the date of his decision.

(Tr. 20; 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ erred at Step Two of the sequential analysis by not finding that headaches are a severe impairment, contrary to substantial evidence of record (Dkt. #12, Brief at 7-10); the ALJ erred in requiring objective evidence of plaintiff's condition and limitations, contrary to the nature of fibromyalgia, and the absence of such evidence inappropriately weighed against plaintiff in the ALJ's credibility determination (id. at 10-13); the ALJ failed to accord the treating physicians' opinions the requisite weight and deference, he failed to provide sufficient evidence for discounting those opinions, and he substituted his own opinion for that of a medical expert (id. at 13-16); the ALJ's adverse credibility finding is not supported by the record (id. at 16-17); and the ALJ failed to include all impairments and limitation in his RFC determination, particularly the lack of concentration, pain and fatigue.  (Id. at 18-20).

In response, defendant contends that substantial evidence supports the ALJ's finding at Step Two that plaintiff's headaches were not severe (Dkt. #15, Brief at 4-7); substantial evidence supports the ALJ's credibility finding (id. at 7-10); the ALJ properly weighed the opinion from Dr. Abarientos and did not substitute his opinion for that of a medical expert (id. at 10-12); and substantial evidence supports the ALJ's findings at Step Five.  (Id. at 13).

In her reply brief, plaintiff reiterates that substantial evidence from plaintiff's treating source support plaintiff's limitations attributed to her headaches which the ALJ failed to account for in his RFC determination (Dkt. #19, at 2-4); and the treating physician's opinions were entitled to substantial weight and cannot be disregarded based on the lack of objective evidence.  (Id. at 4-6).

18

A. SEVERITY DETERMINATION

A claimant seeking social security benefits must bear the burden of showing that he has a medically severe impairment or combination of impairments.  See Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987).  The severity regulation requires the claimant to show that she has an "impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. §§  404.1520(c), 416.920(c); see Bowen, 482 U.S. at 146.

As stated above, in his decision, the ALJ concluded that plaintiff has severe impairments of fibromyalgia, affective disorder, anxiety disorder, and substance abuse disorder.  (Tr. 13-14).  When addressing plaintiff's headaches, the ALJ noted:

> The claimant has also received treatment for persistent headaches. However, . . . neurological testing has been normal.  This impairment appears to have improved with treatment.  While she may occasionally experience a headache that would interfere with her work functioning, there is no evidence that her reported headaches occur with such frequency or duration to cause more than minimal functional limitations for significant periods of time.

(Tr. 14).  Accordingly, the ALJ concludes that plaintiff's headaches are "non-severe."  (Id.). The ALJ's finding is consistent with Social Security Rule ["SSR"] 85-28 which clarifies that an "impairment is not severe if it has no more than a minimal effect on an individual's physical or mental ability(ies) to perform basic work activities."  1985 WL 56856, at *3 (S.S.A. 1985). Moreover, the medical record supports the ALJ's conclusion. In January 2010, plaintiff reported to Dr. Abarientos that her "pain is better and has leveled off[,]" and while she complained of having more severe headaches, she reported that they usually respond to Imitrex, which has reduced the frequency of her headaches to three time a month, usually lasting twenty-four to forty-eight hours.  (Tr. 538; see Tr. 538-39).  For plaintiff to establish that she suffers from a severe impairment that effects her ability to perform basic work

activities, she must show more than the existence of the impairment.   <u>Bowen</u>, 482 U.S. at 153.   The "mere   diagnosis of an impairment says nothing about the severity of the condition."   <u>See Burrows v. Barnhart</u>, 3:03 CV 342 (CFD)(TPS), 2007 WL 708627, at *6 (D. Conn. Feb. 20, 2007)(citations & internal quotations omitted).   Plaintiff does not complain about her headaches in any of her many other medical appointments with Dr. Abarientos, or with her treating providers at the Community Health Center, and rather than detailing how her headaches effect her ability to perform basic work activities,[12] plaintiff reported to Dr. Abarientos that she exercised a lot, was gardening and was walking her dog regularly.   (Tr. 523).[13]

_____

[12]Examples of basic work activities are: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, usual work situations; and dealing with changes in a routine work setting.  SSR 85-28, at *3.

[13]Moreover, it is harmless error for an ALJ to fail to find an impairment non-severe as long as the ALJ determines that at least one of the claimant's impairments is severe, and then continues with the remaining steps of the analysis. <u>See Jones-Reid v. Astrue</u>, 934 F. Supp. 2d 381, 402 (D. Conn. 2012)(Following the lead of other circuit courts, the Court noted that "[a]t step two, if the ALJ finds an impairment is severe, 'the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.'") (citation omitted), <u>aff'd</u>, 515 Fed. App'x 32 (2d Cir.2013). In this case, the ALJ does continue to the remaining steps of the sequential analysis after concluding, <u>inter alia</u>, that plaintiff's fibromyalgia is a severe impairment.

Plaintiff also contends that the ALJ's conclusion that plaintiff's headaches are a non-severe impairment is contrary to the opinion of Dr. Abarientos, her treating rheumatologist, who estimated that plaintiff would be off-task twenty-five percent or more of the work day, and would be absent more than four days a month.  (Dkt. #12, Brief at 8).  The ALJ's credibility finding and the weight assigned to Dr. Abarientos' opinion is discussed in Section III.B. <u>infra</u>.

Additionally, plaintiff's contends that the ALJ's "emphasis on the absence of sufficient objective findings is contrary to medicine and [the] law of fibromyalgia, and constitutes error, particularly in his decision not to credit the treating rheumatologist's assessment of limitations." (Dkt. #12, Brief at 13; <u>see id.</u> at 12-13).  In this case, the ALJ did conclude that plaintiff's fibromyalgia is a severe impairment. (Tr. 13); <u>see</u> Section II.B. <u>infra</u>.

B. TREATING PHYSICIAN'S OPINION

"The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."  Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008), quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(internal quotations & alteration omitted).  Generally, "the opinion of claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Burgess, 537 F.3d at 128, quoting 20 C.F.R. § 404.1527(d)(2)(when the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, . . . [the ALJ] will give it controlling weight.")(additional citations omitted); see also Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted).   Under the treating physician rule, an ALJ assigns weight to the a treating source's opinion after considering:

> (i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(per curiam), citing 20 C.F.R. § 404.1527(d)(2).  "After considering the above factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" Burgess,  537 F.3d at 129, quoting Halloran, 362 F.3d at 33; see 20 C.F.R. § 404.1527(d)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the

weight we give [the claimant's] treating source's opinion"(emphasis added)).   "[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." Rosa, 168 F.3d at 79 (citations & internal quotations omitted).

Plaintiff contends that the ALJ erred in not deferring to the opinions regarding plaintiff's fibromyalgia, which "amounts to his substitution of his own opinion" for that of plaintiff's treating physician.  (Dkt. #12, Brief at 14)(citation omitted). Plaintiff's challenge to the ALJ's treatment of the physicians' opinions lies with the ALJ's assignment of "significant evidentiary weight[]" to the opinion of the consultative examiner, Dr. Pothiawala, who found "no more than mild to moderate functional limitations and few abnormalities with concentration or social abilities." (Tr. 19; see Tr. 526)(plaintiff "does not seem to have major problems in terms of socializing with people and also relating to people."); see also Tr. 60, 70, 80-81, 89-90 (Drs. Kaplan and Deutsch found that plaintiff has mild difficulties maintaining social functioning, concentration, persistence or pace.)). Plaintiff contends that the ALJ's rationale is flawed because Dr. Pothiawala was evaluating the impact of plaintiff's mental impairments and not her physical pain, and therefore his opinion is not at odds with that of Dr. Abarientos.  (Dkt. #12, Brief at 16).  Additionally, plaintiff contends that the ALJ erred in rejecting Dr. Abarientos' opinion on grounds that his "sweeping limitations are not supported by objective findings."  (Dkt. #19, at 5).

In his decision, the ALJ noted that Dr. Abarientos opined that plaintiff is "severely restricted by fibromyalgia[,]" such that plaintiff "experiences moderate to severe generalized pain in all joints and muscles[,]" and she "would not be able to sit, stand, and walk in any combination for a full eight hours." (Tr. 18).  The ALJ observed that "physical examinations have revealed generally mild abnormalities[;]" plaintiff "retains full muscle strength and had

a normal gait[;]" "[s]he has reported exercising and gardening with tolerable levels of pain[;]" and there "is little objective support for the severe restrictions described" by Dr. Abarientos. (Tr. 19). Thus, the ALJ concluded that Dr. Abarientos' findings are "inconsistent with the longitudinal treatment record and granted little evidentiary weight, although he is a treating medical source." (Id.). See Burgess, 537 F.3d at 129 (before the ALJ will give good reasons for the weight assigned to a treating physician's opinion). In his decision, the ALJ found that plaintiff's fibromyalgia is a severe impairment despite a lack of objective medical evidence for plaintiff's pain; however, he discounted Dr. Abarientos' opinion precisely because of a the lack of objective findings consistent with his opinion.

Plaintiff is correct that fibromyalgia symptoms are subjective and therefore elude objective measurement. Montanez v. Astrue, No. 3:07 CV 1039 (MRK)(WIG), 2008 WL 3891961, at *17 (D. Conn. Aug. 1, 2008); see Green-Younger, 335 F.3d at 108. However, the Second Circuit has made clear that "[w]hile we recognize fibromyalgia is 'a disease that eludes [objective] measurement,' mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability." Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008); quoting Green-Younger, 335 F.3d at 108.

When plaintiff first began treatment with Dr. Abarientos on November 2, 2009, he noted that plaintiff was taking Amitriptyline which, Dr. Abarientos noted, "helps her with her sleep and pain somehow[,]" (Tr. 510), suggesting that he questioned the correlation. Additionally, Dr. Abarientos opined that while plaintiff's "clinical picture is suggestive of fibromyalgia or chronic pain syndrome[,]" her clinical exam "is completely unremarkable with [a] normal bone scan." (Tr. 511; see Tr. 578 (normal bone scan)). When plaintiff was seen by Orthopedic Associates of Middletown on November 30, 2009, for her back and bilateral

23

leg pain, her range of motion in the lumbar spine was limited by eighty percent with pain in flexion and extension, and the straight leg raising was positive bilaterally.  (Tr. 535). However, the results of an MRI of the lumbosacral spine were normal.  (Tr. 537).

When plaintiff returned to Dr. Abarientos on January 20, 2010, she reported that her "pain [was] significantly better[,]" and she was "not preoccupied with pain anymore like before."  (Tr. 504). Four months later, plaintiff reported to Dr. Abarientos that she was "[d]oing well" on Neurontin (Tr. 502), and Dr. Abarientos noted that plaintiff denied significant pain.  (Tr. 501).   Plaintiff reported that "she sometimes skips her dose of Neurontin during the day when her pain is not significant[,]" and she is "trying to stay active."  (Id.).  She has intermittent generalized pain but it is "tolerable and better since she started Neurontin." (Id.). On July 21, 2010, Dr. Abarientos noted that plaintiff's pain is "under relatively good control[,]" she has been exercising and doing a lot of gardening, as well as walking the dog, but "complains of soreness after doing a lot of activities."  (Tr. 523).  In addition to taking Neurontin and Methadone, she was taking Ibuprofen for her pain, and although she presented with multiple tender points, she rated her pain a three out of ten. (Id.).  Dr. Abarientos noted that plaintiff's fibromyalgia was "clinically stable."  (Id.).

When he completed his Fibromyalgia Medical Source Statement on behalf of plaintiff in January 2011, Dr. Abarientos noted that plaintiff has eighteen tender points and her symptoms include: hypersensitivity to touch, fatigue, chronic widespread pain, sleep disturbance, muscle weakness, subjective swelling, premenstrual syndrome, frequent severe headaches, cognitive dysfunctions, PTSD, numbness and tingling, dysmenorrhea, dizziness, chronic fatigue syndrome, depression, seizure disorder, and a history of intravenous drug use

24

and Methadone maintenance.  (Tr. 580; <u>see</u> Tr. 580-83).[14]  He opined that plaintiff's pain, which is located in her lumbosacral spine, cervical spine, thoracic spine, chest, and bilateral shoulders, arms, hands/fingers, hips, legs, knees, ankles and feet (Tr. 581), is "moderate to severe, generalized, involving all joints [and] muscles[,]" and her pain is precipitated by changes in weather and fatigue.  (<u>Id.</u>).  Dr. Abarientos opined that plaintiff is likely to be off task about twenty-five percent or more of the workday, and she is likely to have good days and bad days and will be absent more than four days a month.  (Tr. 583).[15]

Dr. Abarientos' diagnosis of fibromyalgia is consistent with the American College of Rheumatology ["ACR"] guidelines, which include "primarily widespread pain in all four quadrants of the body and at least [eleven] of the [eighteen] specified tender points on the body."  <u>Green-Younger</u>, 335 F.3d at 107, <u>citing</u> SSA Memorandum, Fibromyalgia, Chronic Fatigue Syndrome, and Objective Medical Evidence Requirements for Disability Adjudication, at 5 (May 11, 1998)(explaining that the signs for fibromyalgia, according to the ACR, "are primarily the tender points")(additional citations omitted); <u>see also Montanez</u>, 2008 WL 3891961, at *17 (noting clinical findings of painful tender points, which is a recognized method for diagnosing fibromyalgia)(footnote omitted).  Additionally, in contrast to the <u>Rivers</u> case, Dr. Abarientos opined that plaintiff has severe restrictions as a result of her fibromyalgia; the ALJ also noted in his opinion that Dr. Abarientos opined that plaintiff is

---

[14]<u>See</u> note 9 <u>supra</u>.

[15]Dr. Abarientos also noted that she has mild drowsiness from Gabapentin, and that she is limited to walking half a block, sitting and standing for fifteen minutes at a time, standing/walking for about two hours, and sitting for about four hours. (<u>Id.</u>).  According to Dr. Abarientos, plaintiff needs to shift positions and must walk every hour for about fifteen minutes, and she may need to take unscheduled breaks three to four times a day for fifteen to twenty minutes.  (Tr. 582). Additionally, plaintiff can occasionally lift ten pounds, and can occasionally stoop, crouch or squat, and look down, but can rarely climb stairs and ladders.  (<u>Id.</u>).

"severely restricted by fibromyalgia." (Tr. 18).  See also Rivers,  280 F. App'x at 22 ("Unlike the claimant in Green-Younger – whose doctor diagnosed her fibromyalgia as 'severe' and the cause of marked limitations in the claimant's activities of daily living – the record in this case contains no such finding.")(internal citation omitted);.

As in Green-Younger, it appears that the ALJ, like the SSA consulting physicians, "misunderstood" the nature of fibromyalgia.  335 F.3d at 108.  While the ALJ in this case did find plaintiff's fibromyalgia to be a severe impairment, the ALJ "effectively required 'objective' evidence for a disease that eludes such measurement."  Id.  The ALJ noted in his decision that although plaintiff complained of "diffuse physical pain[,] . . . few significant abnormalities were identified apart from [plaintiff's] subjective complaints of pain" (Tr. 17); "physical examinations have revealed few significant abnormalities" (id.); "[o]verall, the claimant's allegations of significant physical limitations are not entirely supported by objective medical findings[]" (id.); Dr. Abarientos' "sweeping limitations are not supported by objective findings[,]" and there is "little objective support for the severe restrictions described by Dr. Abarientos." (Tr. 18-19).  Just as in Green-Younger, "each of the ALJ's determinations turned on a perceived lack of objective evidence."  335 F.3d at 108; see also Crossman v. Astrue, 783 F. Supp. 2d 300, 309 (D. Conn. 2010)("it is clear that the ALJ's decision to discount [the treating physician's] opinion was erroneously founded at least in part on the absence of objective evidence."). The ALJ erred basing his rejection of Dr. Abarientos' opinion regarding plaintiff's fibromyalgia on a lack of objective support in the record.  Moreover, his rejection of this treating physician's opinion fell hand in hand with the ALJ's treatment of plaintiff's subjective complaints.[16]  See Green-Younger, 335 F.3d at 107 ("[t]he fact that [the treating

---

[16]In his decision, the ALJ recites the following standard language:

physician] relied on Green-Younger's subjective complaints hardly undermines his opinion as to her functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool.")(citation & internal quotations omitted).    Accordingly, on remand, the ALJ should reevaluate the weight that should be afforded to Dr. Abarientos' opinion in "accordance with . . .  Green-Younger, where the Second Circuit criticized the ALJ for his reliance on a 'perceived lack of objective evidence[,]" and shall "reassess the credibility of [plaintiff's] statements regarding the pain and functional limitations caused by her fibromyalgia[.]"  Crossman, 783 F. Supp. 2d at 309.[17]

V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion to Reverse the Decision of the Commissioner, and/or Remand (Dkt. #12) is granted in part such that this matter is remanded for further proceedings consistent with this Recommended Ruling; defendant's Motion to Affirm (Dkt. #15) is denied.

The parties are free to seek a district judge's review of this recommended ruling.  See 28 U.S.C. § 636(b)(**written objection to ruling must be filed within fourteen**

---

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 16).   The ALJ continues, "[t]he objective evidence provides some support to the claimant's allegations."  (Id.).  While an ALJ is entitled to make a determination that the claimant's subjective complaints of pain are inconsistent with the objective medical evidence, see 20 C.F.R. §§ 404.1529(a), 416.929(a); see also Reyes v. Astrue, No. 3:11 CV 1403 (AVC), 2013 WL 696498, at *5 (D. Conn. Feb. 26, 2013), the ALJ in this case, erred in discounting plaintiff's complaints of pain and limitations attributed to her fibromyalgia in the absence of objective support.  See Crossman, 783 F. Supp. 2d at 309 (treatment of statements relating to fibromyalgia).

[17]Additionally, on remand and in accord with this decision, the ALJ shall consider all of plaintiff's impairments and limitations in Step Five of the sequential analysis.

**calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local

Rule for United States Magistrate Judges, United States District Court for the District of

Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file**

**timely objection to Magistrate Judge's recommended ruling may preclude further**

**appeal to Second Circuit)**.

  Dated at New Haven, Connecticut, this 3rd day of March, 2014.


         /s/ Joan G. Margolis USMJ
        Joan Glazer Margolis
        United States Magistrate Judge